(78 P.3d 1188)
No. 88,787

CAROLYN NARRON, *Appellee,* v. CINCINNATI INSURANCE
COMPANY, *Appellant.*

Opinion filed November 14, 2003.

*J. Philip Davidson, Roger M. Theis,* and *M. Duane Coyle,* of Hinkle, Elkouri Law Firm, L.L.C., of Wichita, for appellant.

*Gerald W. Scott,* of Gerald W. Scott, P.A., of Wichita, for appellee.

Before RULON, C.J., ELLIOTT and MARQUARDT, JJ.

MARQUARDT, J.: Cincinnati Insurance Company (Cincinnati) appeals the trial court's grant of summary judgment to Carolyn Narron, who sought underinsured motorist (UIM) coverage from her Cincinnati automobile insurance policy. We reverse.

In January 1998, Narron was driving a vehicle owned by her parents, Milburn and Mildred Chestnut. Narron's parents were passengers. The vehicle was struck by a vehicle driven by Arnold Pinto, and it is undisputed that Pinto was solely liable for the accident. Mildred Chestnut was killed. Narron suffered severe injuries. Narron's medical bills are estimated to be in excess of $283,332.

Pinto's Farmers Insurance Company (Farmers) policy had limits of $100,000 per person and $300,000 per occurrence. Narron received $100,000 from the Farmers policy. The Chestnuts were insured by St. Paul Fire & Marine Insurance Company (St. Paul) with a UIM policy limit of $300,000 per occurrence. St. Paul paid $200,000 to Mildred's estate. Narron received $100,000 from St. Paul.

Narron, an insurance agent, sold herself an insurance policy with Cincinnati which had UIM coverage of $300,000 per accident.

Narron believed that she would receive $300,000 if she was involved in an accident with an underinsured driver and if her injuries warranted the payment.

Narron made a claim with Cincinnati under the UIM portion of her insurance policy. In October 1998, Cincinnati advised Narron that it believed the UIM coverage in her insurance policy was excess over any other applicable UIM coverage. Cincinnati believed that St. Paul was the primary UIM insurer. Cincinnati cited the case of *Farmers Ins. Co. v. Prudential Property & Cas. Ins. Co.*, 10 Kan. App. 2d 93, 692 P.2d 393 (1984), *rev. denied* 237 Kan. 886 (1985), to support its claim.

Narron responded by filing suit against Cincinnati. In her petition, Narron claimed that Cincinnati wrongly denied her claim for UIM benefits. Narron asked the trial court to award her $300,000 plus attorney fees.

Following the initial discovery process, Narron and Cincinnati filed motions for summary judgment. After a hearing, the trial court concluded that the excess-escape clause contained in Cincinnati's UIM coverage would not apply in this case because the damages were so severe and would leave the insured uncompensated for injuries from the accident. The trial court concluded that Cincinnati should pay Narron $300,000 and awarded Narron $120,000 in attorney fees. Cincinnati timely appeals.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. In order to preclude summary judgment, the facts subject to the dispute must be material. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1274-75, 38 P.3d 679 (2002).

### Underinsured Motorist Coverage

Underinsured motorist coverage is intended to provide compen-

sation to innocent persons who are damaged through the wrongful conduct of motorists who, because they are uninsured or underinsured and not financially responsible, cannot be made to pay for damages. The underinsured motorist statute is to be liberally construed to provide a broad protection to the insured against all damages resulting from bodily injuries that are caused by an automobile accident and arise out of the ownership, maintenance, or use of the insured motor vehicle, where those damages are caused by the acts of an underinsured motorist. *Rich v. Farm Bur. Mut. Ins. Co.*, 250 Kan. 209, 215, 824 P.2d 955 (1992).

The underinsured motorist coverage protects the named insured wherever he or she may be, whether in the described vehicle, another owned vehicle, a nonowned vehicle, or on foot. This is true unless the insurance company expressly limits the scope of the UIM coverage. See *Farmers Ins. Co. v. Gilbert*, 14 Kan. App. 2d 395, 403, 791 P.2d 742, *aff'd as modified* 247 Kan. 589, 802 P.2d 556 (1990).

K.S.A. 40-284(b) reads:

"Any uninsured motorist coverage shall include an underinsured motorist provision which enables the insured or the insured's legal representative to recover from the insurer the amount of damages for bodily injury or death to which the insured is legally entitled from the owner or operator of another motor vehicle with coverage limits equal to the limits of liability provided by such uninsured motorist coverage to the extent such coverage exceeds the limits of the bodily injury coverage carried by the owner or operator of the other motor vehicle."

K.S.A. 40-284(d) reads:

"Coverage under the policy shall be limited to the extent that the total limits available cannot exceed the highest limits of any single applicable policy, regardless of the number of policies involved, persons covered, claims made, vehicles or premiums shown on the policy or premiums paid or vehicles involved in an accident."

The words "legally entitled to recover as damages" mean that the insured must be able to establish fault on the part of the underinsured motorist which gives rise to the damages and to prove the extent of those damages. *Winner v. Ratzlaff*, 211 Kan. 59, 64, 505 P.2d 606 (1973).

### Cincinnati's Policy

On appeal, Cincinnati argues that its policy provides excess coverage and the language of its policy, when applied to the underlying facts of this case, rendered its coverage excess, with the St. Paul policy owned by the Chestnuts being primary. Cincinnati argues that since its coverage is excess, no UIM benefits are due to Narron.

The interpretation of an insurance policy, like the construction of any written instrument, is a question of law. Whether an ambiguity exists in an insurance policy is similarly a question of law to be determined by the trial court. The appellate court's review of conclusions of law is unlimited. *Levier v. Koppenheffer*, 19 Kan. App. 2d 971, 976, 879 P.2d 40, *rev. denied* 255 Kan. 1002 (1994).

In construing an insurance policy, the whole document must be considered in order to ascertain the intention of the parties. Policies must be construed according to the sense and meaning of the terms used, and if the language is clear and unambiguous, it must be taken in its plain, ordinary, and popular sense. When an insurance policy is not ambiguous, the court's function is to enforce the contract as made. To be ambiguous, the contract must contain provisions or language of doubtful or conflicting meaning. *American Media, Inc. v. Home Indemnity Co.*, 232 Kan. 737, 739-40, 658 P.2d 1015 (1983).

An excess-escape clause limits liability to the excess damages not covered by other insurance or to escape it altogether if there is no excess due above the limits of other policies. *Farmers Ins. Co. v. Prudential Property & Cas. Ins. Co.*, 10 Kan. App. 2d 93, 95, 692 P.2d 393 (1984), *rev. denied* 237 Kan. 886 (1985). Narron's Cincinnati insurance policy contains a section entitled "Other Insurance." It reads:

"If there is other applicable similar insurance available under more than one policy or provision of coverage:

"1. Any recovery for damages for **bodily injury** sustained by a covered person may equal but not exceed the higher of the applicable limit for any one vehicle under this insurance or any other insurance.

"2. Any insurance we provide with respect to a vehicle you do not own shall be excess over any collectible insurance.

"3. We will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits."

Cincinnati maintains that since Narron was injured while operating the Chestnuts' vehicle, the excess-escape clause is activated and Narron may recover benefits only if Cincinnati's UIM limits are greater than the collectible coverage available under the Chestnuts' St. Paul policy.

On the other hand, Narron argues that Cincinnati's interpretation of the policy language leaves her without coverage, creating an unintended absurdity. Narron is offended by the idea that she should have competed with her father over the UIM benefits available from St. Paul. Narron specifically argues that Cincinnati's "other insurance" clause makes Cincinnati's UIM coverage primary as to her. Narron believes that St. Paul's UIM benefits were excess as to her, since she did not own the vehicle that was involved in the accident. Essentially, Narron contends that while St. Paul and Cincinnati argue that they are excess, it leaves her without any coverage at all.

In *Progressive Casualty Ins. Co. v. Farm Bureau Mut. Ins. Co.*, 27 Kan. App. 2d 765, 767, 9 P.3d 565, *rev. denied* 270 Kan. 899 (2000), this court noted the "persuasive authority" which holds that the insurer of a vehicle involved in a collision has primary UIM coverage for a passenger of that vehicle, with the insurer of a passenger providing excess coverage. In coming to this conclusion, the panel relied on *State Farm Mutual Auto Ins. Co. v. Powers*, 169 Vt. 230, 732 A.2d 730 (1999).

Powers was a passenger in a car driven by Darren Smith when they were involved in an accident. Powers received coverage up to the policy limit from the liable driver. Powers then filed UIM claims with the insurance companies who insured Powers, Powers' family, and Smith. All of the policies contained "other insurance" clauses which are similar to the ones at issue in the case currently before this court. The Vermont Supreme Court was faced with the question of which company was primary as to Powers. 169 Vt. at 234-35.

In making its decision, the Vermont court noted that courts generally conclude the policy issued to the owner of the vehicle in-

volved in the accident provides the primary UIM coverage, meaning that the issuer of the policy is liable up to the policy limits. The court specifically noted that it was not concerned insurers would attempt to provide only excess coverage in an attempt to avoid UIM liability. The court believed that in situations where all of the applicable policies purported to provide only excess coverage, that coverage will be deemed to be primary and thus shared pro rata among the insurers. 169 Vt. at 236-38.

Where two primary policies both contain excess "other insurance" clauses, the excess clauses are generally treated as mutually repugnant and the loss is pro rated between the insurers. 15 Couch on Insurance 3d § 219:47 (2000). However, where a vehicle owner's policy and a policy providing nonowned vehicle coverage to the driver have conflicting excess "other insurance" clauses, the vehicle owner's policy is deemed primary and the driver's policy excess. 15 Couch on Insurance 3d § 219:48.

It seems clear that in cases where there are two "other insurance" clauses, the policy covering the car owner is primary, with the driver's policy acting as excess coverage. See *Progressive Casualty Ins. Co.*, 27 Kan. App. 2d at 767. St. Paul's policy in this case was the primary coverage; thus, Narron's UIM benefits would be excess coverage.

However, that does not end our inquiry. The excess-escape provision in Narron's policy indicates that its coverage would be excess over any "collectible" insurance. On appeal, Narron contends that the first $200,000 from St. Paul was not "collectible insurance" to her because it was a primary coverage payment to Milburn Chestnut after the death of his wife. Thus, Narron argues that the Cincinnati UIM coverage cannot be excess because there was not any other collectible insurance.

If an insurance policy is clear and unambiguous, the words are to be taken and understood in their plain, ordinary, and popular sense, as an average or reasonable person with ordinary understanding would construe them, when used to express the purpose for which they were employed in the policy. *Clark v. Prudential Ins. Co.*, 204 Kan. 487, 492, 464 P.2d 253 (1970).

"Collectible" has been defined as: "Debts, obligations, demands, liabilities that one may be made to pay by means of legal process." Black's Law Dictionary 263 (6th ed. 1990). "Collectible" insurance is directed to a policy which is legal and valid, as distinguished from one which is invalid such as for fraud or uncollectible such as for insolvency. The insurance policy must be collectible at the time of the accident. *State Farm Mutual Insurance Company v. Vines*, 193 So. 2d 180, 182 (Fla. Dist. App. 1966). The word "collectible" in an insurance policy does not refer to the actual payment of a sum of money but instead refers to the existence of other applicable and available insurance coverage based on the particular claim in question. *Bernard Lumber v. Louisiana Ins. Guar.*, 563 So. 2d 261, 265 (La. App. 1990).

Narron's contention that the St. Paul insurance was not collectible to her is not supported by any authority. The UIM benefits from St. Paul were collectible insurance as to Narron, since the coverage was available to her under the policy. Given that the St. Paul and Farmers policies were collectible insurance as to Narron, we conclude that the Cincinnati policy is excess insurance. Our question then is whether Cincinnati has any obligation to Narron via this excess insurance provision.

Cincinnati's policy states that in cases of bodily injury, coverage may equal but not exceed the limit of any policy of insurance which is involved in the insurable event. Narron's policy has a $300,000 limit on UIM coverage. It is also undisputed that the Chestnuts' St. Paul policy has an identical $300,000 limit. Thus, under the plain language of the policies, the Cincinnati UIM coverage would apply only if Narron did not have access to $300,000 in collectible insurance.

Narron argues that she paid for greater coverage than what was guaranteed to her by K.S.A. 40-284(b) and (d). However, she cannot escape the language of her policy, which clearly requires that if there is "other applicable similar insurance," recovery is capped at the "higher of the applicable limit for any one vehicle under this insurance or any other insurance." In addition, we believe that much of Narron's argument is founded on the mistaken belief that the Cincinnati policy is primary as opposed to excess coverage.

## Anti-Stacking

Stacking is the right of a claimant to pool coverage under two or more policies to satisfy a loss that exceeds the coverage of any one of the policies. The basic difference between the concept of stacking and the operation of "other insurance" clauses is that "other insurance" clauses address rules for determining responsibility if more than one policy applies, while stacking addresses whether more than one coverage which would otherwise be applicable should, in fact, be applied at all. 15 Couch on Insurance 3d § 219:2.

"Stacking" is the practice of obtaining insurance loss payments on duplicate coverages. It is the ability of an insured to recover under two or more endorsements for a single loss suffered by the insured. *McNemee v. Farmers Insurance Group*, 228 Kan. 211, Syl. ¶ 2, 612 P.2d 645 (1980). K.S.A. 40-284(d) limits coverage to the highest limits of any single applicable policy and is a codified anti-stacking provision. The "other insurance" clause of Narron's policy also contains a clause which limits her recovery to the applicable limit for any one vehicle.

Cincinnati argues that since the St. Paul and Cincinnati policies carried a $300,000 cap on UIM benefits, $300,000 is the highest total amount that Narron can recover.

In its journal entry, the trial court noted that it did not believe this was a stacking case. We disagree. We have already concluded that Cincinnati's UIM coverage was excess over the UIM coverage in the Chestnuts' St. Paul policy. We now find that Narron's total available recovery must be capped at $300,000, as this is the UIM cap in both applicable insurance policies.

We understand that Narron believes she is entitled to greater benefits since she paid insurance premiums. We also understand that Narron was involved in a devastating accident. However, the language of the policy controls. Cincinnati's UIM benefits are excess over any collectible insurance. Narron had access to $300,000 in collectible insurance from St. Paul and Farmers. K.S.A. 40-284(d) and the language of Narron's policy mandate that Narron's potential recovery be capped at $300,000. Therefore, Narron is not entitled to receive any additional benefits from Cincinnati.

### Attorney Fees

In her original petition, Narron asked the trial court to award her attorney fees pursuant to K.S.A. 40-256 and/or K.S.A. 40-908. It does not appear that the trial court made an overt finding on the issue of bad faith. However, the trial court awarded Narron attorney fees in the amount of $120,000.

On appeal, Cincinnati maintains that it had just cause in denying Narron's claim. Cincinnati disputes the idea that Narron is entitled to attorney fees simply because she prevailed in front of the trial court. In the alternative, Cincinnati argues that the $120,000 award is unreasonable and excessive.

The issue of whether the trial court had the authority to impose attorney fees under a particular statute is a question of law over which appellate review is plenary. *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 879, 953 P.2d 1027 (1998).

K.S.A. 40-256 reads, in relevant part:

"That in all actions hereafter commenced, in which judgment is rendered against any insurance company as defined in K.S.A. 40-201 . . . if it appear from the evidence that such company, society or exchange has refused without just cause or excuse to pay the full amount of such loss, the court in rendering such judgment shall allow the plaintiff a reasonable sum as an attorney's fee for services in such action, including proceeding upon appeal, to be recovered and collected as a part of the costs."

It has been held that whether attorney fees are to be allowed depends upon the facts and circumstances of each particular case. Where the only issue between the parties is a factual dispute with respect to coverage under an insurance policy, and the insurer has refused to pay the full amount of the insured's loss for such reason, the phrase "without just cause or excuse" means a frivolous and unfounded denial of liability. However, if there is a bona fide and reasonable factual ground for contesting the insured's claim, there is no failure to pay without just cause. *Koch, Administratrix v. Prudential Ins. Co.*, 205 Kan. 561, 564-65, 470 P.2d 756 (1970).

Generally, an award of attorney fees is not warranted if the issues in the cause are raised in good faith. See *Garrison v. State Farm Mut. Auto. Ins. Co.*, 20 Kan. App. 2d 918, 931, 894 P.2d 226 (1995).

After reviewing the record on appeal, we do not believe that Cincinnati acted in bad faith. Instead, we believe that Cincinnati made a good faith denial based on applicable statutes and case law as well as the language of Narron's policy. Since Cincinnati did not act in bad faith, K.S.A. 40-256 does not apply, and Narron is not entitled to attorney fees.

Reversed.